UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICHAEL S. DILL,<br><br>                    Plaintiff,<br><br>          v.<br><br>CORRECTIONAL MEDICAL<br>SERVICES (CMS), a private corporation<br>under contract at ISCI, P.A. VALLEY,<br>P.A. WINGERT, and N.A. BELFOR,<br><br><br>          Defendants. | Case No. 1:10-cv-00350-BLW<br><br>**MEMORANDUM DECISION AND<br>ORDER** |

Earlier in this case, the Court denied without prejudice Defendants' Motion for Summary Judgment (Dkt. 21) and sought additional factual submissions from the parties under Federal Rule of Civil Procedure 56(e). (Dkt. 46.) Defendants were permitted to file a renewed motion for summary judgment, which they have done. (Dkt. 50.)

In response, Plaintiff has filed a Motion to Stay Summary Judgment Proceedings (Dkt. 54), a Motion for Leave to Conduct Discovery (Dkt. 55), and a Brief in Opposition re: Motion for Summary Judgment (Dkt. 59). Having fully reviewed the record, the Court

**MEMORANDUM DECISION AND ORDER - 1**

finds that the decisional process would not be significantly aided by oral argument.

Therefore, this matter will be decided on the record before the Court without oral

argument. For the reasons that follow, the Court will deny Plaintiff's Motion for the

Court to Take Judicial Notice (Dkt. 47), deny Defendants' Motion for Summary

Judgment (Dkt. 50), deny Plaintiff's Motion to Stay Summary Judgment Proceedings

(Dkt. 54), and deny Plaintiff's Motion for Leave to Conduct Discovery (Dkt. 55).

**PLAINTIFF'S MOTION FOR THE COURT TO TAKE JUDICIAL NOTICE**

Plaintiff asks the Court to take judicial notice of the court special master report of

Dr. Marc F. Stern, a physician who evaluated the medical care provided at the Idaho

State Correctional Institution (ISCI) by Correctional Medical Services(CMS)/Corizon

and who provided recommendations to the Court, in a currently-pending prisoner class

action lawsuit, *Balla v. Idaho State Board of Correction*, Case No. 81-cv-1165-BLW,

Docket No. 822. Plaintiff argues that the report is relevant because his injury occurred at

ISCI and was treated by CMS/Corizon employees.

Federal Rule of Evidence 201 provides that a Court may take judicial notice of an

adjudicative fact which is "not subject to reasonable dispute in that it is either

(1) generally known within the territorial jurisdiction of the trial court or (2) capable of

accurate and ready determination by resort to sources whose accuracy cannot reasonably

be questioned." The advisory committee's notes to Rule 201 clarify the following

**MEMORANDUM DECISION AND ORDER - 2**

relevant principles. First, adjudicative facts are "simply the facts of the particular case." A

court may not take judicial notice of "legislative facts," which are, in contrast, those facts

"which have relevance to legal reasoning and the lawmaking process, whether in the

formulation of a legal principle or ruling by a judge or court or in the enactment of a

legislative body." The advisory committee's notes further explain that:

> The usual method of establishing adjudicative facts is through the
> introduction of evidence, ordinarily consisting of the testimony of
> witnesses. If particular facts are outside the area of reasonable controversy,
> this process is dispensed with as unnecessary. A high degree of
> indisputability is the essential prerequisite.

Fed. R. Evid. 201 Advisory Committee Note.

In addition, "courts routinely take judicial notice of documents filed in other

courts, . . . not for the truth of the matters asserted in the other litigation, but rather to

establish the fact of such litigation and related filings." *Kramer v. Time Warner, Inc.*, 937

F.2d 767, 774 (2d Cir. 1991). For example, on habeas review, a federal district court can

take judicial notice of portions of the state court record which are not already included in

its own record, if necessary to determine whether a petitioner exhausted his state court

remedies. *United States ex rel. Geisler v. Walters*, 510 F.2d 887, 890 (3d Cir. 1975).

At the time he filed the Motion to Take Judicial Notice, Plaintiff had not reviewed

the Special Master's Report in *Balla*. When Plaintiff filed his Response to the Motion for

**MEMORANDUM DECISION AND ORDER - 3**

Summary Judgment, he attached portions of the Special Master's Report. (Dkt. 59.) Because the Special Master's Report is disputed, as is written on the notice at the top of each page of the Report, it cannot be the subject of judicial notice.

Accordingly, the Motion to Take Judicial Notice will be denied, but the Court has considered the expert report as part of Plaintiff's evidence in its decision below, to the extent that it is relevant to the claims and defenses at issue.

## DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT

Defendants Physician's Assistant (PA) Matthew Valley, Registered Nurse (RN) Will Wingert, Licensed Practical Nurse (LPN) Robert Balfour, and Correctional Medical Services, Inc. (CMS) assert entitlement to summary judgment on all of Plaintiff's Eighth Amendment cruel and unusual punishment claims against them.

**1.      Standard of Law**

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims. . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can]

**MEMORANDUM DECISION AND ORDER - 4**

be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). The requirement is that there be no genuine dispute as to any *material* fact. "Material facts are those that may affect the outcome of the case." *See id.* at 248. The moving party is entitled to summary judgment if that party shows that each material issue of fact cannot be disputed.

To show that the material facts are not in dispute, a party may cite to particular parts of the record, show that the materials cited do not establish the presence of a genuine dispute, or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A)&(B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

Material used to support or dispute a fact must be of the type that can be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or opposition to a motion "must be made on personal

**MEMORANDUM DECISION AND ORDER - 5**

knowledge, set out facts that would be admissible in evidence, and show that the affiant or

declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).[1]

The Court does not determine the credibility of affiants or weigh the evidence set

forth by the non-moving party. All inferences which can be drawn from the evidence must

be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at

630-31 (internal citation omitted). If the moving party meets its initial responsibility, the

burden then shifts to the opposing party to establish that a genuine issue as to any material

fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986).

The existence of a "scintilla" (meaning a glimmer or spark) of evidence in support

of the non-moving party's position is insufficient. *Anderson*, 477 U.S. at 252. Rather,

"there must be evidence on which the jury could reasonably find for the [non-moving

party]." *Id*. Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving

party "if the motion and supporting materials–including the facts considered

undisputed–show that the movant is entitled to it."

---

[1] In determining admissibility for summary judgment purposes, it is the content of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay. *Id*. (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony of contents would not be hearsay).

**MEMORANDUM DECISION AND ORDER - 6**

Plaintiff brings his claims under 42 U.S.C. § 1983, the civil rights statute. To have a claim under § 1983, a plaintiff must show the existence of four elements: "(1) a violation of rights protected by the Constitution or created by federal statute (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Section 1983 is "'not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

To state a claim under the Eighth Amendment, a plaintiff must show that he is incarcerated "under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citation omitted). An Eighth Amendment claim requires a plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard— deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012).

As to the objective standard, the Supreme Court has explained that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only

**MEMORANDUM DECISION AND ORDER - 7**

if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

> The Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain; . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*,

*WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

As to the subjective factor, to violate the Eighth Amendment a prison official must act in a manner that amounts to deliberate indifference, which is "more than ordinary lack of due care for the prisoner's interests or safety," but "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835.

Stated another way, deliberate indifference exists when an "official knows of and [recklessly] disregards an excessive risk to inmate health or safety," which means that he or she "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 838.

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate

**MEMORANDUM DECISION AND ORDER - 8**

indifference claim. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

The Eighth Amendment does not provide a right to a specific treatment. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). A prison doctor's recommendation for a less costly treatment is not deliberate indifference unless the recommendation "was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998).

Generally, if the defendants are able to show that medical personnel have been "consistently responsive to [the inmate's] medical needs, and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," a plaintiff's claims may be dismissed by summary judgment prior to trial. *Toguchi v. Chung*, 391 F.3d 1051, 1061 (9th Cir. 2004).

However, an inmate "need not prove that he was completely denied medical care" to prevail on an Eighth Amendment deliberate indifference claim. *Lopez v. Smith*, 203 F.3d 1122, 1131, 1132 (9th Cir.2000) (en banc) (whether prison officials intentionally

**MEMORANDUM DECISION AND ORDER - 9**

interfered with previously-prescribed medical treatment for inmate's broken jaw when they failed to provide a liquid diet and failed to take inmate to a follow-up visits at the hospital (instead substituting weekly prison clinic visits) was a jury question).

Where an inmate's medical records show that "the defendants provided medical care, medications, and specialist referrals" to the inmate during the time period in question, the inmate can prove deliberate indifference "by showing that prison administrators or physicians denied, delayed, or intentionally interfered with [treatment]," or that they delivered medical care in a deliberately indifferent manner. *Snow*, 681 F.3d at 986. A mere delay in treatment does not constitute a violation of the Eighth Amendment, unless the delay causes serious harm. *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990).

Whether to prescribe narcotic medication to inmates is a decision that is within the discretion of medical professionals, especially regarding whether prescribing the medication would create or sustain a suspected addiction to narcotics. *See Tharp v. Justice*, 2006 WL 1677884 (E.D. Tex. 2006) (whether to treat inmates with narcotic medication, which is potentially addictive, is a topic of ongoing debate among medical professionals, and, thus, it is an area that particularly falls within the reasonable exercise of a professional medical opinion); *Huard v. Essex County Corr. Ctr.*, 2009 WL 1886050, at

**MEMORANDUM DECISION AND ORDER - 10**

*3 (D.N.H. 2009) (a mere disagreement concerning the use of narcotic pain medication falls short of alleging a constitutional violation); *Steele v. Weber*, 2006 WL 3544719, at *7 (D.S.D. 2006) ("Although plaintiff and his previous doctor ... disagree with the Department of Corrections' refusal to allow inmates to use narcotic pain medications, mere disagreement with treatment decisions does not rise to the level of a constitutional violation.").

If a jail or prison has a blanket policy prohibiting all narcotic medication under all circumstances, and the inmate can show a causal link between the policy and the inmate's injury, that circumstance can amount to deliberate indifference. *Estate of Clutters v. Sexton*, 2007 WL 3244437 at *10 (S.D.Ohio 2007). That is, the plaintiff must demonstrate that the policy was the moving force behind the constitutional violation. *See Mabe v. San Bernardino County, Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001) (internal citation and punctuation omitted).

**2.     Introduction**

Plaintiff suffered a one-inch laceration to his right pinky finger on January 27, 2010, when he dropped an 85-pound weight on it. (Plaintiff's Amended Complaint, Dkt. 13, p. 6.) Plaintiff says that he suffered pain for "roughly 8 days," which is through February 4, or "through February 9," which is 13 days. (Plaintiff's Statement, Dkt. 2, pp.

**MEMORANDUM DECISION AND ORDER - 11**

1-2.) These are either estimations or credibility issues. There are a number of other variations in Plaintiff's story in the record that call into question his credibility; nevertheless, the variations are not quite to the level of being self-contradictory, and credibility is not factored in at summary judgment (though it is critical at trial).

The record reflects that Plaintiff consistently complained about severe pain in his finger from January 27 to February 8. He was first provided with 400 mg. of Ibuprofen on the evening of the injury, which was increased to 800 mg. of Ibuprofen the next day. No other medication was ever provided.

Plaintiff's complaints were made orally to medical staff, orally to prison staff (because he believed his problem presented a medical emergency), and through the prison grievance process (where Inmate Concern Forms (ICFs) are received by correctional officers and then channeled to the person to whom the form is addressed or the person in charge of the subject matter of the ICF. The record also reflects that Plaintiff used the correct procedure for requesting medical care–through Health Services Request (HSR) Forms, also called "kites," four times: his initial HSR for care immediately after the injury, one for pain the evening of the injury (January 27), one on January 29 (two days post-injury), and one on January 30 (three days post-injury).

Plaintiff's claims boil down to two points: (1) that he was not ever provided with a

**MEMORANDUM DECISION AND ORDER - 12**

follow-up examination by a medical professional with the expertise and authority to reassess his injury, and (2) that medical providers refused to re-evaluate his need for a stronger pain medication other than the 800 mg prescription-strength Ibuprofen he was prescribed when RN Wingert consulted with Dr. Adrian the day after the injury. (See Response to Motion for Summary Judgment, Dkt. 59.)

**3.     Discussion**

The Court will frame the discussion based on the chronology of the injury and subsequent treatment and requests for additional medical care.

**January 27, 2010.**   Plaintiff injured his right pinky finger, when he dropped an 85-pound weight on it. He filed a Health Services Request (HSR) form/"kite" to request medical help. In response, Defendant Physician's Assistant (PA) Matthew Valley examined Plaintiff at 4:00 p.m. Plaintiff had a one-inch long incision on his right pinky finger. (Matthew Valley Affidavit, Dkt. 50-6, pp. 2-3.) His bleeding was controlled, and his pain at that time was reported to be moderate. (*Id* .) Plaintiff was not in acute distress. There was some decrease in flexion in the finger, but no deformity. PA Valley determined that Plaintiff had a laceration, and possibly a fracture or tendon injury, though Plaintiff had some flexion. (*Id*.)

Valley, assisted by Defendant Licensed Practical Nurse (LPN) Robert Balfour,

**MEMORANDUM DECISION AND ORDER - 13**

cleansed and stitched the wound, administered a local anesthetic used for minor surgery, ordered an x-ray, dressed the wound, and applied antibiotic ointment. (*Id*., ¶ 6.) The medical record entered by PA Valley shows that Plaintiff was told to have a follow-up appointment to have the range of motion in his finger checked in two days, and to have a follow-up appointment in seven days to have the sutures removed. (*Id*.; Dkt. 50-3, p. 16.)

Valley offered Plaintiff Ibuprofen. Plaintiff does not dispute that he declined the Ibuprofen. Valley advised Plaintiff to keep his finger elevated above his head, which would help alleviate pain and swelling. Plaintiff alleges that he asked for a narcotic medication, to which Valley allegedly responded that the prison policy is that narcotics are not prescribed; Defendant contests this point.[2] Dr. Lossman clarifies that, due to the high risk of addiction and potential for abuse in the prison setting, narcotics are prescribed only when medically necessary. (Second Affidavit of  Dr. Scott Lossmann, Dkt. 503-3, ¶ 23.)

**January 27, 2010 (later that same evening).** Plaintiff orally complained to unit officers about pain. Officers contacted LPN Balfour, who told officers Plaintiff had to submit an HSR/kite to received further medical attention. Plaintiff initially refused to do

---

[2] Plaintiff's request for narcotic medication *before* his severe pain set in may be indicative of narcotic-seeking behavior; or perhaps he was anticipating that severe pain would set in based on the type of injury sustained. Regardless, that is a question for the jury.

**MEMORANDUM DECISION AND ORDER - 14**

so.  (Robert Balfour Affidavit, Dkt. 50-4, p. 3.)

**January 27, 2010 (still later that same evening).** Plaintiff submitted an HSR/kite stating "Finger hurts need help!" (Dkt. 50-3, p. 25.) LPN Balfour responded by visiting Plaintiff in his cell. The only thing Defendant Balfour could offer within his authority was 400 mg. of Ibuprofen every 6 hours; he advised Plaintiff not to take more than 2 tablets per dose. (Balfour Aff., Dkt. 50-4, p. 3.)

**January 27, 2010 (even later that same evening).** Approximately an hour after Balfour gave Plaintiff the medication, unit staff called again, because Plaintiff was still complaining of pain. Plaintiff had already been given ice. He refused to keep his finger elevated as instructed, which would have reduced the swelling and pain. Balfour advised Plaintiff that he was not authorized to give him any stronger pain medication and advised him to see sick call the next morning for an evaluation for stronger pain medication. (Balfour Aff., Dkt. 50-4, p. 3.)

The *Balla* expert report evaluating medical care at ISCI, prepared by Dr. Stern, calls into question whether Defendant Balfour had the authority or expertise to assess Plaintiff's need for medication. If Balfour had access to a medical professional with authority and expertise that Balfour could call in the middle of the night regarding a change of medication, he chose not to do that. In addition to the Stern report, the Affidavit

**MEMORANDUM DECISION AND ORDER - 15**

of Dr. Ralph D. Heckard, another *Balla* expert, states: "There were many after-hours and weekend events that should have been directly attended by an independent licensed practitioner that were instead addressed by licensed practical nurses who were assigned duties beyond their licensed scope of care."[3] (Dkt. 59-4, p. 5.) These two expert opinions call into question whether Balfour exercised his independent medical judgment (if, in fact, he had authority and expertise to do so), or whether he knew he should, but did not try to, contact a medical professional with additional authority and expertise to reassess Plaintiff's condition.[4]

**January 28, 2010.** The next morning, Plaintiff saw Defendant RN Wingert in the hallway of the medical unit, who took the time to consult with Dr. Adrian for Plaintiff, even though Plaintiff had appeared at the medical unit without an appointment. Plaintiff

---

[3] As noted above, the Court will not take judicial notice of Dr. Stern's report, because Defendants dispute its contents. However, at the summary judgment stage, Dr. Stern's report can be considered as a submission of an expert witness's opinion, because it is accompanied by an affidavit signed under penalty of perjury (Dkt. 822-4 in Case No. 1:81-cv-01165-BLW), and because Dr. Stern could appear at Plaintiff's trial to testify consistently with his report. However, consistent with the Federal Rules of Evidence, at the trial stage of proceedings Plaintiff will have to either produce Dr. Stern as a witness in person, or take steps to try to show that Dr. Stern's report is admissible in Dr. Stern's absence. The same is true for Dr. Heckard.

[4] If Defendants are able to show at trial that Balfour is a medical professional with proper authority and expertise to reassess Plaintiff's pain and that Balfour made an independent medical determination that Plaintiff's injury and complaints of pain did not warrant a change in medication, then the subjective prong of the deliberate indifference test would not be met. Or, the jury may simply determine that the injury was non-serious, which would mean the objective prong of the best is not met.

**MEMORANDUM DECISION AND ORDER - 16**

immediately was authorized a prescription of 800 mg. of Ibuprofen for 30 days. Plaintiff

alleges that Wingert said that the medical staff would call him to the medical unit on

January 29 to be checked for mobility in the finger and he would be scheduled to come in

within 10 days to have the stitches removed. (Amended Complaint, ¶ 25.)

Defendant Wingert also allegedly told Plaintiff that Plaintiff was not going to be

prescribed anything more than Ibuprofen. Plaintiff again points to this statement, repeated

by each medical professional, as evidence of a CMS policy against issuing narcotics to

inmates. However, Defendants have presented sufficient evidence showing that Plaintiff

himself has been treated with narcotics when he had a serious medical condition at ISCI.

Therefore, the record adequately demonstrates that there is no blanket policy against

prescribing narcotics at the prison, but the issue here is a more subtle variation on that

theme.

One of the reasonable inferences each Defendant's alleged anti-narcotics statement

raises is whether–once an injury has been diagnosed as "non-serious" and prescription-

strength Ibuprofen distributed to the inmate–there is a custom that no further assessments

regarding pain are made, regardless of how many times the inmate complains that the

medication did not work. Here, it appears that Defendants never examined Plaintiff again

(or had Plaintiff sent to a proper medical professional to be examined if the diagnosis was

**MEMORANDUM DECISION AND ORDER - 17**

beyond their scope of expertise), to reassess and determine whether (1) Plaintiff was malingering; (2) Plaintiff was exhibiting narcotic-seeking behavior; or (3) a true need for a different medication, test, or treatment existed.

Plaintiff's allegations that all three Defendants cited a policy or custom as the reason they could not provide Plaintiff with a stronger medication raise a genuine dispute as to whether there is a CMS custom to avoid reassessment because narcotics are to be rarely prescribed, and whether this custom discourages medical professionals from changing Ibuprofen to another non-narcotic or a narcotic medication, where the inmate continues to complain, rather than relying on their professional judgment or referring the patient to a medical professional who has authority and expertise to reassess the condition.

A difficult issue the Court has struggled with in this case is whether this is all much ado about nothing–because a pinky finger cut almost does not meet the standard for an objectively serious injury. However, the fact that Plaintiff was given a *30-day prescription* of maximum strength Ibuprofen gives the Court pause as to whether the injury was, in fact, a very minor injury, as Defendants portray it in their Affidavits. The infection raises the injury to the level of a serious injury, and, though the infection was treated quickly when it became so obviously infected that a correctional officer recognized it, Defendants' actions in failing to implement the course of follow-up treatment initially set out in the

first examination and ignoring Plaintiff's pleas for re-examination most likely contributed to the infection.

If Plaintiff faked his pain to try to obtain narcotics, he did an good job. Plaintiff submits evidence from Correctional Officer Michelle Nick, who states that she recalls that Plaintiff was in a lot of pain and that medical said he had to wait until sick call. (Dkt. 59-6, p. 2.) Plaintiff also submits Affidavits from several inmates, one of whom described Plaintiff's finger as looking "like an overcooked hot dog" that "actually busted back open once the stitches were out" (Dkt. 2-4, p. 3.) All of the inmates describe the fact that Plaintiff complained incessantly about his pain for a time period of between 10 days and three weeks. (Dkt. 2-4, pp. 3-7.)

Also on January 28, 2010, Plaintiff wrote an ICF to Jeff Shahan, a supervisor in the medical unit: Ibuprofen 800s and ice not helping pain. The ICF was received by Officer Lindberg, but no one ever responded to it. (Dkt. 2-5, p. 1.)

Also on January 28, 2010, Plaintiff wrote another ICF, this one addressed to Medical Staff #1015. He stated that the Ibuprofen and ice were not working, and that he felt that medical staff were not responding to the seriousness of his pain and being deliberately indifferent to his medical needs. (Dkt. 2-5, p. 1.) The ICF was received by Staff Member 0477; no one responded to it.

**MEMORANDUM DECISION AND ORDER - 19**

**January 29, 2010.** Plaintiff submitted an HSR/"kite" stating: "Still haven't seen a

doctor, finger keeping me awake to[o] painful IBs -– Ice not helping." (Dkt. 50-3, p. 26.)

The documentation states only "Plan: taken care of." The "HSR Triage" portion of the

form is dated January 31, 2010, and the bottom of the form is signed by an LPN and dated

February 8, 2010. There is no indication that Plaintiff received any health care on January

29 or 31, 2010. In fact, as noted above, January 29 was the date the first follow-up visit

should have taken place, according to PA Valley's medical report. However, no follow-up

visit was scheduled for Plaintiff, either by Defendants or in response to Plaintiff's

HSR/kite. Dr. Stern cites "delays or no responses to HSRs" as a problem at ISCI. (Dkt.

59-5, p. 3.)

**January 30, 2010**. Plaintiff submitted a second HSR/"kite": "4 days with pain in

finger. Help please!! IBs - and Ice are not helping." (Dkt. 50-3, p. 27.) The HSR Triage

was completed on February 1, 2010, and the "Plan," written in by the LPN on February 8,

2010, noted: "Patient complained of no pain." There is no indication in the record that

Plaintiff was examined on January 30 or February 1, 2010.

**February 1, 2010.** On this date, PA Valley evaluated the x-ray report of Plaintiff's

finger. The results of the x-ray showed slight soft tissue swelling, but no acute fracture or

**MEMORANDUM DECISION AND ORDER - 20**

articular pathology. (Valley Aff., Dkt. 50-6, at p. 4.) PA Valley determined that Plaintiff did not need any additional follow-up treatment "with respect to plaintiff's suspicion of a possible fracture." (Dkt. 50-6, ¶ 8.) However, the record does not show why the range of motion was not checked two days after injury, why no provision for further disinfection of the wound was made, or why Plaintiff's pain complaints should not have been reassessed.

**February 3, 2010.** Plaintiff wrote an ICF to PA Valley. Plaintiff asked why he has not had a follow-up appointment. "I was given Ibuprofen and ice for the "pain." Well IB's don't kill the pain they relieve swelling, well swelling down and I'm still in super pain." The ICF was received by Officer Nick, #4354. (Dkt. 2-5, p. 3.) Valley did not respond to the ICF.

Also on this date, Plaintiff wrote an ICF to Correctional Officer Bingham. Plaintiff asked Bingham to contact medical because his finger was in severe pain and might be infected, and Plaintiff wants to know if Bingham contacted medical. Officer Bingham did, in fact, contact medical with the information that Plaintiff's finger might be infected. (Dkt. 2-5, p. 2.)

When Officer Bingham called medical, it was LPN Balfour who was sent to assess whether Plaintiff had an infection during the evening of February 3. LPN Balfour came to Plaintiff's unit to check his finger. Balfour allegedly said,"the wound looks fine," "the

**MEMORANDUM DECISION AND ORDER - 21**

pain is part of the healing process," and "medical is not going to give anything besides Ibuprofen to inmates for pain management." (Amended Complaint, Dkt. 13, p. 9.) Balfour reports that the finger was pink, rather than red (redness is a common sign of infection) and that it was not warm to the touch, or unusually swollen. (Balfour Aff., ¶ 8.) This objective observation Balfour made matches the content of Plaintiff's ICF to Valley on the same day, where Plaintiff noted his swelling "was down," but he was still in pain. (Dkt. 2-5, p. 3.)

However, the question remains whether Balfour again declined to give Plaintiff any pain medication based on a CMS custom against reassessment. The expert report raises the question of whether Balfour, as an LPN, had the expertise or authority to determine whether Plaintiff should be given additional pain medication beyond prescription-strength Ibuprofen. (Dkt. 59-5, p. 4) ("Making independent assessments (the nursing equivalent of a diagnosis) and prescribing nursing interventions is the sole domain of the RN and is beyond the scope of an LPN.").

Interestingly, February 3 is seven days from the date of injury–the date PA Valley marked as the date for the sutures to be removed. Defendants did not call Plaintiff to the medical unit to have the sutures removed, nor did Balfour summon anyone who had authority and expertise to remove the stitches when he examined Plaintiff's finger for

**MEMORANDUM DECISION AND ORDER - 22**

signs of infection.

**February 3, 2010 (later that evening).** After Balfour visited Plaintiff on February 3, Plaintiff wrote an ICF to Balfour. "I seen you tonight on 2-3-10. Why will nobody help me? I have been in some serious pain since 1-27-10! I have not seen a doctor I've only seen the PA who was negligent enough to not even give bandages or ointment. What is going on?" The ICF was received by Officer Nick, #4354. (Dkt. 2-5, p. 4.) Balfour never responded to the ICF.

Also this same day, after Balfour's visit, Officer Bingham also wrote a response to the ICF addressed to Bingham earlier in the date. The response was: "CMS came and saw you in the unit at 8:10 p.m. on 2-3-10." (The ICF was received by Officer #7914, and Answered by Bingham, #0479.) (Dkt. 2-5, p. 2.)

**February 5, 2010.** Plaintiff wrote an ICF to the Grievance Coordinator. Plaintiff states that he sent in his grievance with all of the ICFs about his medical care. The response on 2/10/10 was: "your grievance has been received and is being processed; It is due on March 6, 2010." (Dkt. 2-5, p. 2.)

**February 6, 2010.** Correctional Officer Soto recognized that Plaintiff had an infected finger and sent Plaintiff to the medical unit. (Dkt. 2-5, p. 5.) This date is three days past the day PA Valley identified in the medical records that the sutures should have

**MEMORANDUM DECISION AND ORDER - 23**

been removed. RN Wingert removed the sutures and cleansed the infection, but the visit was not documented in the medical records. PA Wingert says the lack of documentation means the infection was very minimal, but his response to the ICF Plaintiff wrote to him said that the infection "was greatly dissipated." (Affidavit of Will Wingert, Dkt. 50-5, pp. 4-5.) That a minimal infection could be greatly dissipated could be, but is not necessarily, contradictory.

**February 8, 2010.** Plaintiff alleges that RN Wingert saw him in follow-up for the infection, that Plaintiff reported pain at that time,[5] and that RN Winger again denied him any other medication. RN Wingert states that he does not recall the visit, but, if he did see Plaintiff, he would have informed him that he was authorized only to administer or prescribe 200 mg. of Ibuprofen. (Dkt. 50-5, p. 5.) This statement again raises the question of whether RN Wingert was acting based on custom in refusing to summon a medical professional with greater authority and expertise, or whether he was exercising professional medical judgment within his scope of authority. It is unclear if the February 8 notes on the January 29 and 30 HSR/kites correspond to this February 8 visit, because the notes were written by an LPN, not an RN.

───────────────

[5] As noted earlier, Plaintiff's own written statement says that he suffered pain for "roughly 8 days," which is through February 4, or "through February 9," which is 13 days. (Plaintiff's Statement, Dkt. 2, pp. 1-2.)

**MEMORANDUM DECISION AND ORDER - 24**

**February 10, 2010.** Plaintiff saw the medical unit in preparation for his discharge on parole. No complaints of pain were noted on the record; Plaintiff states that no one asked him whether he was in pain. (Second Lossmann Aff. ¶ 19.)

**February 17, 2010 - September 1, 2010.** Plaintiff was released on parole (*Id*., ¶ 19), and sought no medical care or medication for his finger during the time period he was on parole.

**September 2, 2010.** Plaintiff's parole was revoked and he was re-incarcerated. (*Id.*, ¶ 19.)

**January 17, 2011.** Plaintiff complained he had numbness in his right pinky finger and associated pain. He was examined, and his finger was noted to have healed well, with full range of motion and full strength. The diagnosis was possible nerve damage, and he was issued a 90-day prescription of Neurontin, used to treat neuropathic pain. (*Id*., ¶ 22.) No further medical care for the finger was sought.

## 4.    Conclusion

On this record, the Court concludes that the ratio of Defendants' responses to Plaintiff's complaints is too low to satisfy the Court that Defendants are entitled to summary judgment on the issue that they relied on reasonable medical judgment within their areas of authority and expertise when they chose to treat Plaintiff's pain with only

Ibuprofen and when they never followed up on the status of the injury or pain. At trial, Defendants may be able to fill in the gaps where the questions lie in this record. However, this is Defendants' second opportunity at summary judgment, and, on this record, it appears that Plaintiff's complaints of pain and the pre-set follow-up visit schedule were ignored. The lack of follow-up visits seemed to have contributed to the onset of the infection, especially given that Plaintiff was provided with no disinfecting supplies or plan at the outset.

Defendants have not suggested that someone, other than themselves, regularly manned the medical unit during the 8 to 13 days Plaintiff's injury was at issue. The record also reflects that, when Plaintiff *was* given care during the course of his injury, Defendants Valley, Wingert or Balfour usually attended to him. The reasonable inference to be drawn from the whole record is that Defendants heard or received Plaintiff's later requests for help and did nothing.

Beyond the lack of follow-up visits, the lingering question is whether CMS medical professionals have a custom to not reassess (or not summon a higher professional to reassess) an inmate's pain once it has been determined that a narcotic medication is not medically necessary and the inmate has been given the maximum dosage of Ibuprofen.

Clearly, some of the treatment was appropriate: the initial treatment by PA Valley

**MEMORANDUM DECISION AND ORDER - 26**

and LPN Balfour; the increase in the Ibuprofen medication to 800 mg. by RN Wingert; and the removal of the stitches and treatment of the infection by RN Wingert.

However, a question whether Defendants were deliberately indifferent to Plaintiff's serious medical needs arises from Balfour's attempt to assess Plaintiff's pain himself and not consult another medical professional when Plaintiff reported increasing pain each time Balfour saw Plaintiff; the failure of any Defendant to see that Plaintiff had a follow-up examination by a qualified medical professional within the time frames set by Valley; Wingert's alleged statements that he was not authorized to provide narcotic medication rather than summoning another medical professional with that authority; Wingert's actions in diagnosing pain issues that may be outside his authority and expertise; and the ignoring of Plaintiff's requests for reassessment by Valley, Wingert, and Balfour during the 13-day period.

Defendants have not borne their burden of proof to show that they adequately managed Plaintiff's pain in the face of his ongoing complaints, because there is no evidence of re-evaluation in the record. However, there is evidence in the record that Plaintiff complained to Defendants that the pain medication that had been prescribed was insufficient to address Plaintiff's pain. The Constitution does not require Defendants to ensure that an inmate is pain-free, but it does require that medical personnel treat an

**MEMORANDUM DECISION AND ORDER - 27**

inmate's condition that could result in an "unnecessary and wanton infliction of pain." *McGuckin v. Smith,* 974 F.2d at 1059-60. The record presents a genuine dispute of material fact as to whether the injury was serious and whether Defendants knew of Plaintiff's complaints and disregarded them based on deliberate indifference (including adherence to a custom rather than making an individual assessment). For all of these reasons, summary judgment will be denied as to Valley, Wingert, Balfour, and CMS.

## PLAINTIFF'S MOTION TO STAY SUMMARY JUDGMENT PROCEEDINGS AND MOTION TO CONDUCT DISCOVERY

This case is a few months short of being three years old. Unlike most prisoners, Plaintiff spent several months on parole, when he could have obtained further expert opinions or investigated other aspects of his case. This case has been in summary judgment proceedings since April 1, 2011, which is two years ago. (Dkt. 21.)

After the Court ordered supplementation of facts for summary judgment, Defendants' pending Motion for Summary Judgment was filed on May 8, 2012. (Dkt. 50.) On May 23, 2012, Plaintiff sought an extension of time to respond. (Dkt. 53.) On June 4, Plaintiff filed a Motion to Stay Summary Judgment Proceedings (Dkt. 54) and a Motion for Leave to Conduct Discovery. (Dkt. 55.) On October 16, 2012, Plaintiff filed a detailed response to Defendants' Renewed Motion for Summary Judgment. (Dkt. 59.) The Court has considered whether the decisional process would be aided by the type of discovery

**MEMORANDUM DECISION AND ORDER - 28**

that Plaintiff wishes to gather and submit, and has concluded that anything of the nature Plaintiff wishes to submit would not significantly aid the decisional process.

Federal Rule of Civil Procedure 56(d) provides that, when facts are unavailable to the nonmoving party, he may be granted additional time to obtain the facts needed to contest the motion for summary judgment. To warrant application of this subsection, the nonmoving party must show by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify his opposition. The Court has the following options in ruling on the motion: "(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

Plaintiff argues that the Affidavits of Dr. Scott Lossmann, Robert Balfour, Will Wingert, and Matthew Valley reveal CMS policies, protocols, and other procedures and that Inmate Andrew J.J. Wolf has told Plaintiff that Defendants possess other documents that are relevant to Plaintiff's causes of action. Mr. Wolf states in an Affidavit that he used to work as a paralegal prior to April 2007 (six years ago). Mr. Wolf was involved in reviewing legal documents in a state court case where various contractors were suing the Idaho Department of Transportation over payment for the construction costs regarding the "Flying Y" construction project. (Dkt. 54-2.) In that process, Mr. Wolf learned about the

**MEMORANDUM DECISION AND ORDER - 29**

manner in which the State solicits bids for services. Mr. Wolf also states that he has in his possession copies of the IDOC request for proposal for medical services, CCA's cost proposal, CCA's technical proposal, and various meeting documents. Mr. Wolf states that Defendants are in possession of the contract documents between IDOC and CMS/Corizon, and that these documents would be persuasive evidence to demonstrate Defendants' deliberate indifference to Plaintiff's medical needs.

Mr. Wolf's statements and conclusions about transportation construction contracting and CCA are too far off the mark to be considered relevant. Neither would the information about contract documents between IDOC and CMS/Corizon speak to the particular issues in this case, as shown above. Therefore, the Court agrees with Defendants' position that he has not demonstrated the need for the additional time to gather the evidence, and that the facts Plaintiff seeks to discover would not defeat summary judgment on the discrete issues in this case (mainly, whether Plaintiff suffered a serious injury that required prescription of a narcotic or reassessment by a physician's assistant or physician), and, hence, Plaintiff has not satisfied the requirements of Rule 56(d).

In addition, some of the proposed discovery requests are duplicates of earlier requests of Plaintiff. For example, he seeks medication protocols for prescribing pain

**MEMORANDUM DECISION AND ORDER - 30**

medication, but the Court already required Defendants to produce that earlier in this case. (Dkt. 54-2, p. 4; Dkt. 42; Dkt. 44.)

After reviewing the entire record, the Court concludes that the particular items Plaintiff seeks would not aid his case, and it would unduly prejudice Defendants by preventing this case from reaching a conclusion.

Plaintiff has already provided expert opinions raising a question of fact as to whether prison medical staff sometimes operate outside of the scope of their expertise, and whether prison medical staff who gave him care did so in his case. Accordingly, Plaintiff's Motions for additional discovery and a stay will be denied.

## ALTERNATIVE DISPUTE RESOLUTION

Plaintiff shall consult with Defendants' counsel no later than 14 days after entry of this Order, to determine whether Plaintiff and any Defendant is willing to attend a judicial settlement conference with a United States Magistrate Judge to attempt to settle the remaining issues. If so, then Defendants' counsel shall file a request for referral to a settlement conference. Otherwise, this case will be set for a jury trial.

## ORDER

**IT IS ORDERED:**

1.      Defendants' Renewed Motion for Summary Judgment (Dkt. 50) is

**MEMORANDUM DECISION AND ORDER - 31**

DENIED.

2.     Plaintiff's Motion for Extension of Time to File Response (Dkt. 53) is

GRANTED, and the response has been considered.

3.     Plaintiff's Motion for Court to Take Judicial Notice (Dkt. 47) is DENIED.

4.     Plaintiff's Motion to Stay Summary Judgment Proceedings (Dkt. 54) is

DENIED.

5.     Plaintiff's Motion for Leave to Conduct Discovery (Dkt. 55) is DENIED.

6.     Plaintiff shall consult with Defendants' counsel **no later than 14 days** after

entry of this Order, to determine whether a judicial settlement conference

should be set. If the parties agree, then Defendants' counsel shall file a

request for referral to a settlement conference.



DATED:  **March 28, 2013**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**MEMORANDUM DECISION AND ORDER - 32**